UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

CIVIL ACTION NO. 3:17-CV-92-GFVT

KYAW AUNG and
MARIAN MAY,                                              PLAINTIFFS,


V.


STATE FARM FIRE AND
CASUALTY COMPANY,                          INTERVENOR PLAINTIFF,


V.              **MEMORANDUM OPINION
                      AND ORDER**


USF HOLLAND, LLC and                                    DEFENDANTS/
YRC WORLDWIDE, INC.,                       THIRD-PARTY PLAINTIFFS,

V.


SAR J. BAI,                               THIRD-PARTY DEFENDANT.

*** *** *** ***

The defendants in this matter move to strike six (6) of the plaintiffs' rebuttal experts—

Whitney Morgan, Eldon Isenberg, Randall Benson, Gregory Postel, Eric Goebel, and Jeffrey

Filbeck— on grounds that they are untimely, unjustified, and cumulative. [R. 90]. On April

8, 2020, this Court held a telephonic status conference to discuss the parties' need to extend

certain deadlines under the current scheduling order because further discovery remains to be

completed. [R. 112; *see also* R. 60]. Now, this matter being ripe and after full review, the Court

GRANTS in part and DENIES in part, the pending motion to strike. [R. 90].

## I.

On March 30, 2016 a motor vehicle, driven by Sar Bai, and a tractor trailer, driven by Matthew Brown, collided on Interstate 71 in Carroll County, Kentucky. The two passengers riding in Bai's vehicle— Kyaw Aung and Marian May ("plaintiffs") — filed suit on November 3, 2017 against Brown, the driver, under theories of negligence and negligence per se for violating Ky. Rev. Stat. § § 189.290(1) and 189.340(8)(a). The plaintiffs also sued the owners of the tractor trailer, USF Holland and YRC Worldwide, under principles of respondeat superior and vicarious liability (collectively "defendants"). Plaintiffs seek damages to compensate them for the alleged personal and permanent injuries suffered, including: (1) past, present, and future medical bills, (2) lost wages and the impairment of their ability to earn income in the future; (3) past, present and future physical and mental pain and suffering, as well as increased risk of future harm and/or complications. They also seek an award of punitive damages and attorney fees. [R. 1 at 6].

On December 5, 2017, the defendants filed a Third-Party Complaint against Sar Bai, for negligence and contribution to the plaintiffs' injuries. [R. 10; *see also* R. 22, 24]. On March 25, 2019, State Farm Fire and Casualty Company ("State Farm") filed an Intervening Complaint solely against the USF Holland, LLC and Matthew Brown defendants. [R. 48]. As such, there was a need for an amendment of case deadlines. The most recent scheduling order vacates and amends several deadlines, including the expert disclosure deadlines. [R. 60]. In relevant part, it states as follows:

> 1.
> …
> (b) Rule 26(a)(2) reports from expert trial witnesses are due:
>    i.  From Plaintiff, by Wednesday, November 13, 2019.
>    ii. From Defendants, by Wednesday, January 15, 2020.

iii.   Any party wishing to identify and disclosure a rebuttal expert shall identify and disclose the same per F.R.C.P. (26(a)(2) by Thursday, January 30, 2020.

[R. 60, ¶ 1].

The defense's expert reports were timely disclosed on their January 15, 2020 deadline. After concluding a deposition in Michigan, on January 23, 2020, plaintiffs' counsel sought an agreed and out-of-court, two-week extension from the defendants on their rebuttal report deadline. Plaintiffs' counsel advised and underscored, however, that they remained unsure as whether any rebuttal experts would be needed after all. [R. 90 at 4]. In turn, defense counsel agreed to the extension "out of professional courtesy." [*Id.*].

Twenty-two days later, on February 14, 2020, the plaintiffs revealed seven rebuttal experts. Defendants now seek to strike six (6) of the seven (7) rebuttal experts, alleging that they are not true "rebuttal" experts per Fed. R. Civ. P. 26(a)(2)(D)(ii)'s requirement, but actually *new* affirmative expert opinions that should have (and could have) been disclosed on the plaintiffs' November 13, 2019 expert disclosure deadline. The plaintiffs dispute their motion, arguing that the rebuttal opinions are timely and proper, since they are offered solely to contradict and/or rebut the defense's expert opinions— and not cumulative. [R. 105].

## II.

Rule 26 of the Federal Rules of Civil Procedure requires that parties disclose the identity of any expert witness they intend to use at trial. Fed. R. Civ. P. 26(a)(2)(a). Rule 26 also requires parties to supplement their expert disclosures "in a timely manner" if they learn that the original disclosure "is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Rebuttal evidence may be offered if it is

"intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C) ..." Fed. R. Civ. P. 26(a)(2)(D)(ii). Of course, "[t]his ... merely begs the question of what 'real' rebuttal evidence is. The answer to that question is not clear cut." *Taylor v. Brandon*, No. 3:14-CV-0588-DJH, 2018 WL 3581142, at *2 (W.D. Ky. Jan. 30, 2018). As defined by the Sixth Circuit, our sister court in the Western District of Kentucky has explained that "real" rebuttal evidence is:

> evidence or expert opinion offered by a Plaintiff in response to a defense theory or proof that ordinarily would not be offered by the Plaintiff in its case-in-chief to establish an element of one or more of its causes of action. Put differently, if the evidence or opinion offered in rebuttal is evidence or an opinion that the Plaintiff ordinarily would be expected to offer in support of one or more of the elements of its cause of action, then such evidence or opinion is not 'real' rebuttal evidence and may be properly excluded on such ground by the district court.

*Id.* at * 2.

Rule 37 dovetails with the Rule 26 disclosure-requirement, allowing courts to impose sanctions if a party does not comply with their obligation to disclose. Specifically, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence ... at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Of course, automatic exclusion is not the only avenue the Court could take. *See* Fed. R. Civ. P. 37 (c)(1)(C) (allowing for the Court's discretion to "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)").

Due to the harshness of a Rule 37 sanction, Rule 26 "mandates that [the] trial court punish [the] party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (citing *Vance ex rel. Hammons v. United States*, 182 F.3d 920 (table),

1999 WL 455435, at *3 (6th Cir. June 25, 1999)). The burden of showing that the failure to disclose was substantially justified or harmless is on the party seeking to avoid sanction. *Id.* The Sixth Circuit considers a balancing test of five factors when deciding whether to strike a plaintiff's untimely and/or improper disclosure:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014); *Southern States Rack & Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). "[Our] courts have broad discretion in applying these factors and need not apply each one rigidly." *Bentley v. Highlands Hospital Corp.*, No. 15-97-ART-EBA, 2016 WL 5867496, at *10 (E.D. Ky. Oct. 6, 2016).

Indeed, the admission or exclusion of rebuttal evidence is a matter within the sound discretion of the trial court. *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 345 (6th Cir. 2002). However, "this discretion … is not unlimited. '[W]here ... the evidence is real rebuttal evidence, the fact that it might have been offered in chief does not preclude its admission in rebuttal." *Id.* (quoting *Martin v. Weaver*, 666 F.2d 1013, 1020 (6th Cir. 1981)). For this reason, the Court "runs the substantial risk of having its otherwise broad exercise of discretion reversed." *Taylor*, 2018 WL 3581142, at *2  (quoting *Toth*, 306 F.3d at 345-46). The Court seeks a just result and the utmost fairness in the resolution of this case and for all parties. *See, e.g.,* Fed. R. Civ. P. 1. As such, while the *Howe* factors shall be considered within the backdrop of the Court's evaluation, a Rule 37 sanction is severe; thus, it is not the be-all and end-all.

III.

Defendants seek to exclude four (4) rebuttal medical experts and two (2) liability and damages experts. The Court reviews each of the plaintiffs' expert opinions individually, beginning first with the submission of the defendants' expert reports.

### A. Medical Expert Opinions

The plaintiffs offer the rebuttal opinions of four experts, in an effort to rebut two of the defense's medical experts. The first of the defense's experts is Dr. Richard T. Katz, a neurologist, who opined the following, after closely studying Aung and reviewing the plaintiffs' medical expert opinions:

<u>Impression</u>
- It is clear that Mr. KA suffered major multiple trauma on 3/30/16.
- The clinical course and imaging support[] a significant traumatic brain injury, coma, acute respiratory failure, and a pressure sore. He required facial surgery, ICU care, PEG tube, and post-acute rehabilitation.
- However, at the present time, I also find Mr. Aung is likely exaggerating his cognitive impairments. He is evasive and his effort during different parts of the mental status exam are inconsistent.
- He has a well-fitting and functional prosthesis.
- The challenge of evaluating this patient was increased due to his sparse English (and my nonexistent Burmese), cultural issues, minimal education (reported by the patient as kindergarten only and in another site as 4th grade), patient effort, and interpreter (who sometimes tried to be helpful but added clues that I had not offered).
- Neuropsychological testing of the patient would clearly be limited in this patient due to his education, language barrier, suspected hypomotivation, and cultural issues. I am unable to answer what neuropsychological testing is available in Burmese.
- I do *not* see clear evidence that the patient is unable to live alone or return to work. A home visit and vocational assessment in the place of employment is necessary.
- Mr. Aung's LE is truncated by his country of origin, strong smoking history, poor dentition, and [traumatic brain injury].

[R. 79-11 at 13-14].

In summary, I feel the opinions of [plaintiffs' medical] professionals are simplistic and reflexive. There is no question Mr. Aung suffered a traumatic brain injury. However, the outcomes after traumatic brain injury are highly variable, and many patients similar to Mr. Aung make a very substantial recovery. I feel that because these plaintiff opinions do not have a thorough understanding of Mr. Aung's medico-psychosocial condition, they assume all of his present problems are head injury related. That very well may not be the case. Furthermore, I believe the failure to have a firm grasp on Mr. Aung's condition invalidates many or most of the items in his life care plan.

[*Id.* at 15-16].

The second defense medical expert is Dr. Timothy S. Allen, another neurologist. Dr. Allen also had access to the plaintiffs' medical expert opinions for comparative purposes. In relevant part, his report concluded the following:

Formulation
…
In Mr. Aung's case specifically, there are other complications in evaluation of his current functioning, not the least of which is his poor command of the English language. He was known to have suffered posttraumatic stress symptoms related to a traumatic right below-the-knee amputation from a landmine. A landmine explosion frequently causes an over-blast traumatic brain injury when the shock wave causes blood to be pushed up into the skull compressing brain tissue. He did not receive any treatment or evaluation for that condition that occurred decades earlier. Mr. Aung's minimal academic skills makes premorbid estimation of his cognitive ability quite difficult. While he worked in a factory setting, his job consisted of largely one repeated task, he always worked with family nearby, and had never lived independently in the U.S.

Summary
Mr. Aung had numerous deficits prior to the accident of March 20, 2016 and suffered a traumatic brain injury at that time. The measurements available are imprecise therefore cannot adequately quantify his current cognitive impairments due to the poor understanding of his premorbid functioning and the low utility of using psychological instruments with no normative data on Burmese immigrants. Without additional information being discovered about his premorbid functioning, I believe it is nearly impossible to assess Mr. Aung's decline, if any, from the motor vehicle accident of March 20, 2016.

[R. 79-15 at 2-3].

The plaintiffs offer four (4) rebuttal experts to rebut the defense's theory that the neuropsychological and/or neurological testing that was done on Aung cannot properly measure the attributable extent of his injuries from the 2016 motor vehicle accident. In other words, Aung's injuries were exacerbated by other factors that predated the accident; namely, an old landmine accident, and other culturally relevant factors that are unique to Aung. The crux of defendants' challenges against these rebuttal reports is that the experts' findings are based on a comparison of an undisclosed 2015 scan and a recently-administered 2020 CT scan, done just days after the defendants agreed to a rebuttal deadline-extension. The plaintiffs state that the reports are offered to demonstrate that the testing done on Aung is, in fact, reliable in measuring how the 2016 accident has detrimentally impacted his health and continues to affect his life.

To determine whether the four opinions constitute "real" rebuttal, the Court evaluates each report to determine whether each would (ordinarily) be offered in the plaintiffs' case-in-chief to establish the negligence and reckless behavior alleged against the defendants.

### 1. Randall Benson, M.D.

Dr. Benson is a neurologist. On March 18, 2015, Dr. Benson ordered a CT scan of Aung's brain to show its pre-existing condition. Then on February 4, 2020 another CT scan was done. The plaintiffs timely disclosed Dr. Benson as a medical expert on their November 13, 2019 deadline. [R. 90-2]. However, Dr. Benson was also disclosed as a "supplemental" expert opinion on February 14, 2020, along with the five other experts that the defendants argue are improper, untimely and cumulative.

Dr. Benson's first report was limited to an examination he had with Aung during an evaluation on April 29, 2019. The report also delves into a review of Aung's post-accident records. [R. 90-12]. Dr. Benson summarized his findings as follows:

- Patient w/probably borderline premorbid general intellectual abilities.
- [I]ntellectual functions in the mildly mentally deficient range w/clearly more salient nonverbal than verbal abilities.
- The intellectual assessment was limited secondary to language issues.
- Patient did demonstrate a sig[nificant] discrepancy between his nonverbal, verbal abilities, which makes sense given his language issue; however, even his visual or nonverbal functions were in the mildly mentally deficient range.
- A great many of his higher order neurobehavioral functions were in the impaired range.
- Although this was somewhat of a limited exam, these data would be consistent w/clear-cut cerebral compromise.
…
- He is anosognosic, that is, he is not aware of the extent of his neurological deficits. This reduced insight into his neurological deficits is largely a consequence of the brain injury itself.
- Despite his lack of formal education, he likely had average intelligence prior to his injury, based on occupational history and collateral witness information provided by two family members with whom he continues to live.
- He has severe affective, social/emotional change and severe cognitive deficits, all on the basis of his brain injury caused by the [motor vehicle accident] of 3/30/16.
- He has visual changes, which are a consequence of his brain injury (see Dr. Blair's assessment of 09/05/19).
- He has significant verbal and nonverbal cognitive deficits caused by his [motor vehicle accident] of 3/30/16.
- He is at maximum medical improvement.
- His executive dysfunction, anosognosia, and affective issues (depression and anxiety) will likely keep him from being independent for the remainder of his life.
- He is at a 3-4 times increased risk for development of a neurodegenerative dementia and should be monitored at intervals for cognitive deterioration.

[R. 90-12 at 34-35, 37].

Dr. Benson's new report is limited in scope. In this "supplemental" report, Dr. Benson conducts a side-by-side comparison of a pre-accident, March 18, 2015 CT scan and a very recently done February 4, 2020 CT scan. Because of this, the defendants contend that Dr. Benson's opinion is a new causation opinion that supports the plaintiffs' case-in-chief; specifically because the new opinion is based on a scan that was available prior to plaintiff's

November 13, 2019 deadline and a new scan, done just days after the defendants' expert disclosure deadline. The plaintiffs allege that the new report was conducted in an effort to rebut the defense's opinions of Dr. Allen and Dr. Katz. [R. 105 at 20-21]. Notably, as to whether:

> (1)  the pre-existing condition of Kyaw's brain is an issue;
> (2)  whether Kyaw's brain has improved; and
> (3)  whether this diagnostic testing is confirmatory of the neurological testing identifying where in Plaintiff's brain he suffered damage.

[*Id.* at 21].

Having the benefit of comparing Aung's most recent February 2020 CT scan with his previous March 2015 CT scan, Dr. Benson concluded:

> There is no doubt that the difference between the 3/18/15 and 2/04/20 CT scans is the severe TBI that Kyaw Aung suffered in the 3/30/16 MVA. The severe brain injury has led to a loss of brain substance (atrophy) an enlargement of the spaces filled with spinal fluid. These comparison findings are important to understand the premorbid condition of this patient's brain (prior to 2016 MVA) compared to its post-injury condition and deterioration of his brain from a diagnostic and cognitive standpoint. **Dr. Katz and Dr. Allen** suggest it is not possible to assess Mr. Aung's cognitive decline because of the lack of premorbid information. As a result, they suggest other factors (pre-existing condition/events) as being the potential cause for this patient's neurocognitive decline. In reviewing the 2/4/20 CT imaging, it is clearly demonstrated that this patient has significant ventriculomegaly and findings associated with DAI, including left frontal and left temporal deep white matter encephalomalacia, that were not present in his 2015 CT imaging. This brain damage is extensive and the continued deterioration between 2016 and 2019 is clearly demonstrated by the development of the injury, which will likely continue with time. This patient had a completely normal CT in 2015, just one year prior to the 3/30/16 MVA. Comparing the before and after CT scans, it is evident a severe brain injury occurred which is clearly the cause of his cognitive deficits.

[R. 90-11 at 2 (emphasis added)].

Defendants seek to have Dr. Benson's new opinion stricken because it is an "improper" supplemental *and* rebuttal opinion because it seeks "to bolster [Dr. Benson's]

previously disclosed opinions." [R. 110 at 6]. Defendants allege that "[p]laintiffs' counsel had the favorable [March 2015] CT Scan in his possession long before Plaintiffs' expert disclosure deadline in November of 2019, [and that] it was not given to Dr. [] Benson for review until after Defendants disclosed their experts on January 15, 2020, and after Dr. Benson's discovery deposition on January 22, 2020." [*Id.* at 7]. The plaintiffs do not deny that the 2015 scan was unknown prior to their disclosure deadline.

### 2. Gregory Postel, M.D.

Dr. Postel is a neuroradiologist. Dr. Postel examined the radiological imaging conducted at the University of Louisville Hospital, following the post-March 2016 accident. [R. 90-13]. He also examined the imaging that Dr. Benson conducted in April 2019, and the most recent March 2020 CT scan. [*Id.*]. Dr. Postel concluded his report with a summary of his findings of fact, by offering his own assessment of Dr. Katz and Dr. Allen's opinions. In relevant part, Dr. Postel opined:

> Mr. Aung underwent a CT scan of the head at Owensboro Health on 2/4/20. This exam again demonstrated marked ventriculomegaly and findings associated with prior diffuse axonal injury including left frontal and left temporal deep white matter encephalomalacia. These findings are in stark contrast to the normal CT of the head performed at Owensboro Health on 3/18/15

> In summary, the exams demonstrate an excellent example of the before and after imaging appearance of the brain with normal exams in 2015, a devastating head injury in 2016 and then typical post traumatic sequalae seen in 2019 and 2020. The 2019 and 2020 studies show prominent enlargement of the ventricles pointing to brain atrophy, a common finding which develops following a severe head injury inclusive of diffuse axonal injury. Such axonal injury is commonly associated with severe neurocognitive deficits. Given the normal appearance of the brain in 2015, to a reasonable degree of medical probability, Mr. Aung's brain injury was the result of the 2015 head trauma. The findings are inconsistent with conclusions drawn by Drs. Allen and Katz who contend that there is an absence of evidence relating to Mr. Aung's premorbid condition and relating Mr. Aung's brain injury and deficits to the 2015 [motor vehicle accident].

[R. 90-13 at 1-2].

The defendants disagree with the plaintiffs' use of Dr. Postel because his opinions are equally based on the undisclosed March 2015 CT scan and the recent, also undisclosed February 2020 CT scan ordered by Dr. Benson. The defendants contend that Dr. Postel's opinion is a new affirmative opinion that could have been disclosed by the November 2019 deadline. As such, it is untimely, improper, and cumulative. [R. 90 at 8].

### 3. Eric Goebel, M.D.

Dr. Goebel is a neurosurgeon that also teaches trauma classes at Indiana University School of Medicine. [R. 90 at 8, R. 105 at 23]. Dr. Goebel's opinion is very similar to that of Dr. Postel's, but more concise. His opinion briefly summarizes the development of Aung's head injuries—both before and after the accident. The entirety of his opinion is as follows:

> I had the opportunity to review MRI's and CAT scans of Mr. Aung. There was an initial study in 2015 which was a normal study. He had subsequent CAT scans and MRI's after his trauma, which I understand was a [motor vehicle accident] back in 2016. On the CAT scan upon presentation he had had numerous intraparenchymal hemorrhages consistent with diffuse axonal injury. When you see hemorrhage with this initial presentation as such is indicative of a severe injury. Subsequently his MRI showed again numerous hemorrhages. He had diffusion weighted imaging changes of his corpus collosum consistent with diffuse axonal injury. Again, all of these were indicative of a severe closed head injury. Lastly, he had a CAT scan of his brain done February 4, 2020 at Owensboro Hospital. There is substantial left frontal and temporal encephalomalacia. There is ventriculomegaly, more notable on the left than the right, probably due to volume loss of brain. Subsequently there was an MR) from 2019 indicative of significant head injury as well and there is a report that can be reviewed of that. Regardless, this gentleman suffered an obvious severe head injury. He had marked diffuse axonal injury and the fact that he had a normal CAT scan of his head in 2015 and clear injuries at the time of the MVA in 2016 and subsequent CAT scan here in 2020, showing marked changes compared to his baseline normal scan.
>
> I have no doubt whatsoever that this gentleman would suffer from significant neural cognitive deficits, think his ability to function and make any significant executive decisions and processing would be extremely limited. This trauma he had in 2016 undoubtedly caused marked neurologic impairment. At this point, I will be available further if need be.

[R. 90-14].

Like Drs. Benson and Postel, the defendants oppose the plaintiffs' use of Dr. Goebel as a rebuttal expert because his opinion is based on a review of the pre-accident, March 2015 scan and the most recent February 2020 scan. Accordingly, the defendants assert that Dr. Goebel's opinion is a new causation opinion that supports plaintiffs' case-in-chief, which was available to the plaintiffs prior to their November 2019 disclosure deadline.

### 4. Jeffrey Kent Filbeck, M.D.

Finally, Dr. Filbeck is a radiologist. Dr. Filbeck was the "on-call radiologist who read the CT Scan when it was run on February 4, 2020, and … compared it to the CT Scan that was on record at the hospital." [R. 105 at 24]. He opined as follows:

> Findings: The exam is compared with 3/18/2015. There is significant change since the previous study with mild/moderate diffuse ventriculomegaly. The distance across the frontal horns measures 4.4 cm. There is new low CT density anterior to the left frontal horn, presumed related to previous injury with associated encephalomalacia. There is no CT evidence of acute intracranial hemorrhage. No mass, mass effect or midline shift is seen. The ventricles are normal in shape and position. No abnormal extra-axial fluid collections are evident.
>
> Post contrast imaging demonstrates no abnormal enhancement pattern or abnormal enhancing mass. The visualized paranasal sinuses and mastoid air cells are clear. No osseous destructive changes are seen. Surgical plate is now present above the right orbit and right frontal sinuses.
>
> IMPRESSION:
>
> Ventriculomegaly and abnormal low CT density in the left frontal lobe, presumed related to the patients history of traumatic brain injury. These findings are a significant change from March 2015.
>
> No acute intracranial findings evident.

[R. 90-15 at 1-2].

As with the other medical experts the plaintiffs have listed as rebuttal experts, the defendants contend that Dr. Filbeck's "opinion is a new affirmative expert opinion supporting

Plaintiffs' case-in-chief which is based on information available to Plaintiffs well before the November 13, 201[9] disclosure date." [R. 90 at 9]. The defendants, too, seek to have his opinion stricken.

### 7. Whether to Strike the Medical Expert Reports

The question of striking the plaintiffs' experts turns on both fairness and substance; with each consideration holding great weight. The plaintiffs contend that Dr. Benson is a supplemental opinion, and that Drs. Postel, Goebel, and Filbeck are rebuttal opinions. This Court previously analyzed the distinction between both rebuttal and supplemental opinions, concluding why this distinction matters:

> Imagine if, even after the initial deadline for disclosing experts has passed, a party could offer up (and use at trial) any new expert opinion it wanted. All the party has to do is to call the disclosure some variation of "supplemental" or "rebuttal." In that world, parties would be able to "make an end-run around the normal timetable for conducting discovery." *Disney Enters., Inc. v. Kappos*, 923 F. Supp. 2d 788, 795 (E.D. Va. 2013) (internal quotation marks omitted). The initial disclosure deadline would lose all meaning: Parties would hold back crucial opinions from their initial disclosures, only to drop them on their opponent at the last minute, a nasty surprise falling like a bag of bricks. Rule 26 would, in such a world, only invite the very gamesmanship it was meant to curtail. *See McHugh v. Olympia Entm't, Inc.*, 37 Fed.Appx. 730, 735 (6th Cir. 2002) ("Rule 26 must be read in light of its dual purposes of narrowing the issues and eliminating surprise.").
> …
> [T]he rule [on supplementation] is not a license to freely amend expert reports to bolster a party's position. *See Luke v. Family Care & Urgent Med. Clinics*, 323 Fed.Appx. 496, 499–500 (9th Cir. 2009). Rather, supplementation is limited to "correcting inaccuracies" or "filling interstices" in an initial disclosure. *Munchkin, Inc. v. Playtext Prods., LLC*, 600 Fed.Appx. 537, 538 (9th Cir. 2015) (internal quotation marks omitted). Courts have therefore permitted parties to fill gaps in initial reports when they later learn of the missing information. *See, e.g., Dunning v. Bush*, 536 F.3d 879, 889–90 (8th Cir. 2008) (allowing supplemental report because it provided information that initial disclosure noted would have to be obtained through discovery). But courts have routinely rejected attempts to add new analyses, opinions, or theories under the guise of supplementation. *See, e.g., E.E.O.C. v. Freeman*, 778 F.3d 463, 467 n.7 (4th Cir. 2015); *Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 836 (9th Cir. 2015); *Luke*, 323 Fed.Appx. at 500. This is especially true when the

information underlying the new opinion was available to the party at the time of her initial disclosure. *See Matilla v. S. Ky. Rural Elec. Coop. Corp.*, 240 Fed.Appx. 35, 43 (6th Cir. 2007); *see also* Black's Law Dictionary 563 (10th ed. 2014) (defining "supplemental disclosure" as "[t]he disclosure of additional facts and information, usu[ally] because of previous unavailability").

…

[S]imilarly … rebuttal opinions are limited in scope: [t]hey must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party['s]" expert disclosure. *Id.* The rebuttal expert "may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert." *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013). But they may not "advance new arguments or new evidence" outside the scope of the opposing expert's testimony. *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. 2013) (quoting *Larson v. Wisc. Cent. Ltd.*, No. 10-C-446, 2012 WL 368379, at *4 (E.D. Wisc. Feb. 3, 2012)).

*Bentley v. Highlands Hospital Corp.*, No. 7:15-cv-97-ART-EBA, 2016 WL 5867496, at *4-5 (E.D. Ky. Oct. 6, 2016). Thus, the fundamental question that the Court asks is whether the medical experts' opinions are *true* rebuttal opinions, as envisioned above, or just the plaintiffs' way of using gamesmanship to buttress their case-in-chief with new evidence. So, what is the defense's theory then? In the plaintiffs' view, they believe it is that neurological and/or neuropsychological testing provides an unreliable window into Aung's injuries, and of course healing-progression, given that other external and cultural factors are highly relevant to Aung's life.

As an initial matter, the Court notes that each report is limited in scope, with each offering a comparison of pre and post-accident CT scans. The plaintiffs contend that this was done in an effort demonstrate that Aung's neurological development has, in some effect, been altered by the 2016 motor vehicle accident. Dr. Benson's first and "supplemental" reports differ in form and substance due to the kind of information that he reviewed. The 2020 scan, of course, provides a most updated window into Aung's brain development; this was not

available prior to Dr. Benson's initial review of Aung. By contrast, Dr. Postel had the benefit of taking the following data into account, all one narrative: 1) the CT scans conducted in 2015 pre-accident, 2) the CT scans conducted in 2016-post accident, 3) the MRI imaging conducted in 2019, 4) the most recent February 2020 CT scan, and 5) the work and conclusions of Drs. Benson, Katz and Allen. Dr. Goebel's opinion, on the other hand, differs by Dr. Postel's, in that his perspective comes from the vantage point of an expert in trauma— unlike the other medical experts. Finally, Dr. Filbeck is offered as a medical expert because he was the on-site radiologist that conducted Aung's February 4, 2020 CT scan. Notably, Dr. Filbeck works at the hospital where Aung also received the March 18, 2015 CT scan. As such, the plaintiffs argue that Dr. Filbeck serves as the "best evidence" to rebut Dr. Allen's opinion that Aung "had numerous deficits prior to the accident[,]" and Dr. Katz's opinion that Aung is likely to make a "substantial recovery from his brain injury." [R. 105 at 3, 24; *see also* R. 79-11, 79-15].

The plaintiffs do not deny that the 2020 scan is new evidence; that much is clear. Plaintiffs also do not deny that the 2015 scan was in their possession prior to their expert disclosure deadline. Therefore, why should the Court not strike them as untimely, improper, and cumulative? After all, each report, in some way or another, offers a similar comparative analysis of the same scans— one of which was just recently done and unavailable to the defendants. Thus, as a supplemental opinion, does Dr. Benson's opinion actually supplement and/or clarify any new information, not previously known to the plaintiffs? And what about the other opinions? Is it clear that the motivation of the "rebuttal" opinions is to rebut the defense's proposition that neurological and/or neuropsychological testing is unreliable? The defendants imply that each opinion is a disguise, serving to offer new affirmative opinions that very easily *could have* been disclosed on November 13, 2019. The Court agrees.

It is certainly clear that each report provides different perspectives: Dr. Benson is a neurologist, Dr. Postel is a neuroradiologist, Dr. Goebel is a neurosurgeon, and Dr. Filbeck is a radiologist. The plaintiffs have hired an array of experts, each with different medical backgrounds, and each able to support the plaintiffs' position that Aung's neurological development has undergone a significant change since 2016. While the Court is in no position to judge whether the plaintiffs have successfully met their goal, it is clear that the medical revelations offer nothing contradictory or novel to rebut the defense's theory, that could not have been done prior to February 4, 2020. It is likewise apparent that the defense's acceptance of a two week extension offered the plaintiffs more time to seek new experts and add further undisclosed evidence to support their case-in-chief; all of this, it seems could have easily been gathered and prepared by their November 2019 expert disclosure deadline. In other words, it does not seem like any of these medical expert opinions are true rebuttal opinions; nor do they supplement anything that was previously unknown or undisclosed.

The Court believes that the 2020 CT constitutes new evidence that unfairly surprised the defendants and unfairly prejudices their case. In effect, the Court sees the addition of these new experts, and the way in which the extension was sought, as a form of gamesmanship—the very kind of litigation tactic that Rule 26 aims to prevent. It is up to the Court to be a referee: to watch for and prevent this kind of abuse.

### B. Liability and Damages Expert Opinions

The last two rebuttal opinions that defendants argue should be stricken are two trucking experts: Whitney Morgan and Eldon Isenberg. Their expert opinions are meant to rebut defense expert Kenneth L. Core's report, in which he opined that Holland was not negligent in hiring Matthew Brown. Specifically, because the plaintiffs have only identified Robert Miller, an accident reconstructionist, and James Sobek, a human factors expert, the

defendants believe that both Mr. Morgan and Mr. Isenberg offer affirmative opinions that should have, and could have been disclosed by November 13, 2019. Especially since, "[n]either Mr. Miller nor Mr. Sobek have offered opinions about USF Holland's hiring or retention of Matthew Brown." [R. 105 at 5]. The parties mutually agree that a suit for negligent hiring and retention, under Kentucky law, requires two elements: (1) the employer knew or reasonably should have known that the employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff. *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000). [R. 105 at 26-27, R. 110 at 1-2]

By contrast to the opinions offered by Miller and Sobek, the plaintiffs contend that both Morgan and Isenberg offer different perspectives, given their unique backgrounds:

> Mr. Isenberg has a history as a Kentucky State Police Trooper and a Director of Safety for a trucking company[, and] Mr. Morgan has spent his career in DOT enforcement, has provided DOT compliance training, and is a professional safety consultant. Both were retained by Plaintiffs to provide contradictory or rebuttal evidence solely as to the matters opined … in [defense expert,] Mr. Core's report, and to point out the fallacies from varying perspectives.

[R. 105 at 28]. As such, Morgan and Isenberg were hired solely to rebut and/or contradict Mr. Core's opinions as to:

> [the] three (3) specific questions posed by defense counsel: (1) Was Matthew Brown properly hired; (2) Was Brown properly retained; and (3) if a company installed mobile eye was not functioning properly on the day of the wreck would it have taken the truck out of DOT compliance.

[*Id.* at 29].

The defense expert, Mr. Core, provided a final conclusion after an evaluation of various sets of documents, including: an assortment of files belonging to Mr. Brown, maintenance and police reports, records, photographs, deposition transcripts, letters, and

policy documents— to name a few. [R. 79-7 at 2-3]. At the end of his report he offered his final conclusions, opining that: (1) "Brown was properly hired as a qualified driver for Holland"; (2) that [a]ll in all, [Holland] did what was necessary to properly retain Matt Brown as a safe and productive employee"; and (3) that if the Mobile Eye unit on Mr. Brown's truck was not functioning properly at the time of his accident on March 30, 2016, "which is subject to doubt," it would not have taken his truck out of compliance with the Department of Transportation (DOT) commercial motor vehicle safety regulations. [R. 79-7 at 8-9]. In forming these conclusions, Core methodically went through a step-by step analysis— beginning first with a company profile of Holland, and then delving into the company's requirements when hiring and retaining in carrier driver [R. 79-7 at 4]. These requirements were compared to the DOT's minimum requirements, which he concluded were similar to Holland's driving standards. After reviewing these, Core looked to Brown's driving application. [R. 79-7 at 4-5]. Brown passed all criminal and ability-screening background tests. Brown had been employed as an interstate driver for eight (8) years and had worked for five (5) different companies. Though his application only mentioned one car accident leading to his termination, later investigation revealed that Brown had gotten into two other accidents, undisclosed in his application. After follow-up with both Brown and his former emplyers, Holland learned that the accidents were minor and subsequently hired Brown.

Further review into Brown's employment history with Holland revealed several employment-related issues; namely: (1) several unexcused absences; (2) problems with the Mobile Eye Collision Avoidance System ("Mobile Eye"), which began roughly after installation in the beginning of 2016; and (3) the three car accidents he had while employed with Holland, and the disciplinary actions that followed. [*Id*. 5-8]. Still, after evaluating all of

the evidence and making assessments, Core opined that Holland did not negligently hire Brown, and that he was properly qualified until the March 2016 accident. Moreover, because DOT has no authority to regulate Holland's Mobile Eye system, even assuming Brown's Mobile Eye was defective when the accident occurred, "the DOT would not be able to subject the company to a DOT equipment related citation or allow the DOT to place the truck out of service." [*Id.* at 10].

Now, having evaluated Core's report, the Court examines the two liability and damages experts that defendants seek to have stricken.

### 1. **Eldon Isenberg**

Like Core, in preparing and forming his opinion, Isenberg reviewed an extensive amount of material. [R. 90-10]. Isenberg, of course, had the advantage of viewing the reports of Core, as well as those of Robert Miller and James Sobek's. His rebuttal report follows a similar pattern as that of Core's. First, he begins with Brown's qualification and ends with his opinion on the Mobile Eye. Isenberg, however, more closely dissects DOT regulations; ultimately finding that Holland violated Section 396.11 of the Federal Motor Carrier Safety Administration ("FMCSA") which requires reporting and corrective action to fix issues affecting the safe operation of the vehicle. 49 CFR § 396.11. Like Core, Isenberg also provided his own opinions; specifically, as to whether Brown was negligently hired, given his qualifications and past driving record and employment history, as well as whether any DOT regulations were violated [R. 90-10 at 4, 6]. He also conducted a two-part critique of Core's report. Before doing so, however, he reviewed Brown's call log and cellphone usage while driving violating company policy with respect to cellphone usage. He opined that:

> Mr. Brown was on the phone 1 hr. 43 min while driving. Holland did not have
> a mechanism in place to monitor cell phone usage, which is against company
> policy, illustrates the passive work environment at Holland.

[R. 90-10 at 7]. This inclusion of cellphone-use analysis is something that Core's report did

not address, which the defendants argue constitutes a *new*, affirmative theory. [R. 110 at 3].

In conclusion, Isenberg opined, in relevant part that:

> Holland has in place the necessary and required document to correctly hire a
> CMV driver.
> …
> Holland clearly should not have hired Mr. Brown[;] if they had followed all
> their rules this situation would not have happened.
> …
> Holland has no mechanism in place to enforce their cell phone policy . There
> is nothing in place indicating how Holland was to check if cell phones were
> being used while driving and clearly they were by Mr. Brown.
> …
> Holland does not follow FMCSA regulations regarding repairs listed on
> Driver's Vehicle Inspection Report (DVIR).
> …
> Holland's expert, Mr. Core, clearly overlooked some important practices in
> hiring and retaining a CMV driver.

[R. 79-10. at 8].

## 2. <u>Whitney Morgan</u>

Mr. Morgan's report begins by offering an accident description, describes Brown's

qualifications, and studies Brown's deposition testimony regarding the circumstances of his

accident. [R. 90-7 at 2-5]. Using this testimony, he concludes that Brown's behavior does not

align with the guidelines set in the Commercial Drivers' License Standards for safe operations

of commercial motor vehicles, as set in FMCSA § 383. 49 C.F.R § 383. Specifically, he

concludes that:

> Brown failed to drive defensively and maintain safe control of his CMV, and
> failed to keep a proper lookout and practice proper visual search techniques.
> which fell below the standard of care for professional truck drivers.
> …

> Brown created a hazardous situation for himself and for other motorists, through his failure to exercise proper judgement, his failure to drive defensively and safely control his CMV, his failure to keep a lookout and practice proper visual search techniques, and his failure to control his speed in accordance with the distance he could see ahead, all of which fell below the standard of care for professional truck drivers.
> …
> Brown … failed to properly manage the space in front his CMV, failed to proper hazard perception techniques, failed to have a plan, failed to drive his CMV safely for the night time conditions, and failed to be attentive to his driving duties and not drive distracted, which fell below the standard of care for professional truck drivers.
> …
> Brown … failed to drive his CMV safely for the night time conditions, failed to be attentive to his driving duties and not drive distracted, and failed to drive his CMV with due care when transporting Hazardous Materials, all of which fell below the standard of care for professional truck drivers.

[R. 90-7 at 6-10]. Morgan's heavy emphasis on these driver's license safety regulations, and how Brown allegedly performed in every safety aspect, is also something that Core's report does not touch on.

Finally, Morgan studied Brown's unexcused absences, his accidents, and the disciplinary actions (if any) that were taken. But, before making his final conclusion, he analyzed the deposition testimony of Holland's corporate representative, Mark Domako, and what he knew about Brown's employment history. [R. 90-7. at 11-13]. Morgan also examined Brown's deposition testimony regarding his knowledge on the Mobile Eye deficiencies, concluding that Holland was aware of the problems he was experiencing. [*Id.* at 13-14]. In the end, Morgan opined:

> It is my opinion, within a reasonable degree of probability in the field of commercial motor vehicle compliance, enforcement and safety, that USFH failed to have the necessary safety management controls in place and functioning to meet the safety fitness standards, with regard to Mr. Brown's operations, which fell below the standard of care. It is also my opinion that USFH demonstrated a conscious disregard for safety by hiring and retaining Mr. Brown as a driver, given the information that they had available to them.

Additionally, had they terminated Mr. Brown after the 03/06/2015 accident, instead of allowing him to be reinstated by the union, this accident would not have occurred. … It is also my opinion that USFH and Mr. Brown caused and/or contributed to the cause of the accident as detailed above in this report.

[R. 90-7 at 14].

### 3. <u>Whether to Strike Isenberg & Morgan's Reports</u>

"[R]ebuttal evidence is limited 'to that which is precisely directed to rebutting new matter or new theories presented by the defendant's case-in-chief.' " *Duff v. Duff,* No. 04-345-KSF, 2005 WL 6011250, *5 (E.D. Ky. Nov. 14, 2005) (quoting *Crowley v. Chait*, 322 F. Supp. 2d 530, 550-51 (D.N.J. 2004)). The rebuttal disclosure must contain the same subject matter as defendant's disclosure. *Id.* "Courts vary as to the proper scope of expert rebuttal testimony but generally do not permit a rebuttal report to extend beyond the scope of the other party's expert reports." *Louisville Marketing, Inc. v. Jewelry Candles*, LLC, No. 3:15-CV-084-DJH, 2016 WL 6584916, at *10 (W.D. Ky. Nov. 4, 2016).

After thoroughly evaluating Isenberg and Morgan's rebuttal reports, the Court finds that both reports include portions that exceed the scope of Core's report. First, Isenberg's report exceeds the scope by closely tracking Brown's cellphone log, drawing conclusions from the data and then making assumptions about Holland's allegedly "passive" work culture— none of which was discussed in Core's report. Additionally, Morgan's report exceeds the scope of Core's report by including a detailed explanation of the Commercial Driver's License Standards and Regulations; from this, analyzing step-by-step the way in which Brown allegedly "made several critical mistakes in his driving which fell below the standard of care for professional truck drivers." [R. 79-7 at 5]. Nonetheless, apart from these two portions in each of Isenberg and Morgan's reports, the Court finds that the exclusion of the entire reports

is unnecessary. Isenberg and Morgan are, indeed, qualified rebuttal experts, for the reports fundamentally address the same subject matters as Core's report. The unexcludable portions of Isenberg and Morgan's report, which directly rebut Core's report, may not be stricken. Instead, defendants are more apt to challenge them in court through traditional objections and rigorous cross-examination.

## IV.

Of course, without straying from extraneous matter, the plaintiffs are free to offer their own theories to rebut the defense experts' theories. The plaintiffs are not, however, to exceed the scope of the rules—outside the deadlines of the Court, and into unfair and unchartered territory. Therefore, for the reasons stated above,

IT IS ORDERED that:

1. The defendants' motion to strike [R. 90] is granted, in part, and denied in part.

2. The rebuttal reports of Drs. Randall Benson, Gregory Postel, Eric Goebel, and Jeffrey Filbeck **shall be stricken**.

3. The reports of Eldon Isenberg and Whitney Morgan **shall be stricken, in part**: (a) the section in Isenberg's report detailing Brown's cellphone usage [*see* R. 90-10 at 7]; and (b) the section in Morgan's report, delving into Brown's alleged failure to follow, or adhere to, relevant driver's license safety practices [*see* R. 90-7 at 5-10]. These portions pursue affirmative theories that exceed the scope of Core's report.

4. The parties are DIRECTED to file status reports in ten (10) days indicating whether additional time is needed to conduct expert discovery, and if so, the length of time that is required.

Signed April 30, 2020.



Signed By:

_Edward B. Atkins_   $\mathcal{E}\beta\mathcal{A}$

**United States Magistrate Judge**